HARRIS M. MILLER AND PHYLLIS MILLER, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2093–75.     Filed June 15, 1978.

*Charles E. Hammond* and *Billy S. Sparks*, for the petitioners.
*John W. Paul*, for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for 1970 in the amount of $4,999. The sole issue for decision is whether an interest expense, incurred on a loan obtained to purchase controlling interest in the common stock of a bank, constituted an "investment interest expense" as defined in section 57(b)(2)(D), for purposes of the minimum tax imposed by section 56.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, 1970.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioners, Harris M. and Phyllis Miller, resided in Shawnee Mission, Kans., at the time they filed the petition in this case. They filed a joint Federal income tax return for the year 1970 with the Internal Revenue Service Center at Kansas City, Mo. Petitioners prepared their return using the cash receipts and disbursements method of accounting.

In 1961, petitioner[2] and his brother, Earl Miller (hereinafter Earl), moved to Kansas City, Mo., where they purchased a car dealership known as Miller Pontiac. Petitioner and Earl each owned a one-half interest in this dealership. Prior to this, petitioner had operated an Oldsmobile dealership in Manhattan, Kans., which he relinquished in 1960 in connection with the purchase of Miller Pontiac.

In addition to the operation of Miller Pontiac, petitioner owned and made a number of investments in both stock and real estate. One investment was in Prom Motor Hotels. He began purchasing its stock in 1964 and acquired more shares thereafter. Sometime during the 1960's he merged a motel he had built into this company in exchange for some of its stock. By 1970 he was on its board of directors and owned approximately 20 percent of its shares.

As another part of his investment activity, petitioner purchased stock in three Kansas City area banks: the Country Club Bank, the Twin City Bank, and the Empire Bank. In 1964 petitioner became a director of the Country Club Bank, but he never served as an officer of any of these banks. Petitioner's interest in banking grew, and by 1968 he was actively seeking control of a bank. His initial efforts, however, proved unsuccessful.

In 1969 petitioner finally arranged the purchase of a controlling interest in a bank, the Broadway National Bank (hereinafter BNB), located in Kansas City, Mo. Under the terms of the arrangement made by petitioner, through his attorney, with the controlling shareholders of BNB, a tender offer was extended to all the bank's shareholders to purchase up to 80

---

[2]Since Phyllis Miller is a party to this action solely by reason of filing a joint return with her husband, Harris M. Miller will be referred to as petitioner.

percent of each person's stock in 1969, and the remaining 20 percent in two equal installments in 1970 and 1971, for a purchase price in excess of $18 per share. The controlling shareholders with whom petitioner negotiated under the tender offer arrangement agreed in turn to sell him enough stock to give him no less than 51 percent of the total amount of shares outstanding.

The actual purchases under this arrangement were made by the Milbro Co. The Milbro Co. (hereinafter referred to as Milbro or the partnership) was an oral partnership formed by petitioner and Earl on January 27, 1969. It listed its "principal business activity" as "investments" and its "principal product or service" as "securities" on both its 1970 and 1973 Federal income tax partnership information returns. Petitioner owned approximately a 76-percent interest in Milbro, and his brother, Earl, owned the remaining 24 percent.

Milbro obtained a loan commitment from the United Missouri Bank to finance the stock purchase. This bank agreed to loan up to $1,120,000, which was the maximum amount Milbro would be required to pay in 1969 under the tender offer. Eventually, a total of approximately $900,000 was actually loaned under this commitment. The United Missouri Bank agreed to accept the BNB stock purchased by the partnership as collateral for the loan to the extent of the stock's approximately $11-per-share book value. The remaining portion of the loan was secured by a commitment of $100,000 in cash from petitioner and by petitioner's stock in Prom Motor Hotels.

On January 29, 1969, Milbro purchased 43,793 shares of the 77,000 then outstanding shares of BNB. Milbro ultimately acquired 64 percent of BNB's outstanding stock. During the year 1970, Milbro expended $65,218 to carry the loan used to purchase this stock. Petitioner's share of this interest expense amounted to $50,087.

After Milbro acquired control of BNB, petitioner became president of the bank and Earl became its vice president. Thereafter, petitioner set up an office at the bank and spent the majority of his normal working hours there. As president, petitioner set for himself the primary task of securing new business. During 1970, petitioner received $41,600 from BNB as compensation for his services as president, and Earl received

$14,640 as compensation for serving as vice president. Both petitioner and Earl turned this compensation over to Milbro.

Earl originally formed the partnership, Milbro, primarily to financially assist his brother, the petitioner, in purchasing a controlling interest in BNB. He possessed little interest in banking as such, and his primary concern during 1970 was the operation of Miller Pontiac. Ultimately, Earl resigned his position as vice president of BNB, primarily because of strong pressure from governmental regulatory authorities responsible for overseeing banking practices who expressed serious concern over Earl's lack of personal participation in BNB's operations.

Despite his work at the bank, petitioner retained his strong ties with Miller Pontiac. He was frequently consulted on matters relating to the auto dealership, and at least once a week he would meet for a few hours in the morning to discuss the various problems facing it. He also spent time at Miller Pontiac on Saturdays and on weekday evenings. For the year 1970, petitioner received $50,000 in salary from Miller Pontiac.

Petitioner sold 330 shares of BNB stock in April 1970, which he had acquired in January 1969. He reported the profit from this sale as a long-term capital gain. Petitioner also reported dividends from BNB during 1970 of $6.

In addition to income derived from Miller Pontiac and the BNB salary, petitioner realized income and sustained losses from the following sources in 1970:

| | |
|---|---:|
| Gains on stock and land sales | $19,053 |
| Director's fee (Harris Miller Oldsmobile) | 5,000 |
| Director's fee (Prom Motor Hotel, Inc.) | 6,400 |
| Dividends (Prom Motor Hotel, Inc.) | 15,212 |
| Dividends (Country Club Bank) | 1,628 |
| Dividends (various corporations) | 2,746 |
| Rental income | 2,479 |
| Farming | (1,141) |
| Ponco Co. (a partnership) | (4,388) |
| Seville Motor Inn (a small business corporation) | (2,567) |

During this year, petitioner owned approximately 15 percent of the stock of the Country Club Bank from which he received the $1,628 in dividends.

Shortly after the purchase of the BNB stock, Milbro sold small blocks of shares to petitioner's friends and business associates. During 1970, it sold 789 shares and reported the $5,439 profit as

capital gains. The proceeds from these sales were applied to the partnership's loan.

In addition to these capital gains, Milbro listed the following sources and amounts of income on its 1970 Federal income tax partnership information return:

| | |
|---|---|
| Rents | $100 |
| Insurance commissions | 8,279 |
| Service fee | 4,850 |
| ·Total | 13,229 |

The return also listed deductions for interest amounting to $65,218, and for other expenses totaling $210, resulting in a net loss of $50,499. Schedule K of this return reported the interest as an investment interest expense tax preference.

After 1970 Milbro acquired additional shares of BNB. Included in its purchases was a purchase from petitioner of approximately 400 shares which he had acquired in 1968.

On December 5, 1973, Milbro sold 82,595 shares of BNB stock for $1,934,614. Milbro listed the $751,622 gain realized on this transaction as long-term capital gain on its Federal income tax partnership information return.

When Milbro first acquired control of BNB, its deposits totaled $9 million and its capital structure (including capital surplus and undivided profits) amounted to $875,000. When the sale of stock occurred in 1973, its deposits totaled between $16 million and $17 million and its capital structure amounted to approximately $1,300,000.

## OPINION

In 1969 Milbro, a partnership, borrowed approximately $900,000 to purchase a controlling interest in the stock of a bank, BNB. During 1970 Milbro expended $65,218 to carry this loan. Petitioner, a partner in Milbro with his brother Earl, deducted his proportionate share of this interest, $50,087, on his 1970 Federal income tax return.

The sole issue presented is whether this interest constitutes an "investment interest expense" as defined by section 57(b)(2)(D), which states:

SEC. 57(b). EXCESS INVESTMENT INTEREST.—
(2) DEFINITIONS.—For purposes of this subsection—

\* \* \* \* \* \* \*

(D) INVESTMENT INTEREST EXPENSE.—The term "investment interest expense" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. For purposes of the preceding sentence, interest paid or accrued on indebtedness incurred or continued in the construction of property to be used in a trade or business shall not be treated as an investment interest expense.

If the interest is an investment interest expense, it increases petitioner's "excess investment interest" (as defined in section 57(b)) which section 57(a)(1) includes as an item of tax preference subject to the minimum tax imposed by section 56.

Respondent contends that the circumstances surrounding the purchase and ownership of the BNB stock demonstrate that it was "property held for investment," and, therefore, that the interest on the loan used to purchase the stock constitutes "investment interest." Petitioner contends that the stock was not "property held for investment," but, rather, that it was property held in the trade or business of banking because Milbro's stock ownership enabled petitioner to become president of BNB. In this context, petitioner cites *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), and its progeny for the proposition that stock may constitute property held in connection with a taxpayer's trade or business rather than as an investment where it is intrinsically related to the conduct of the trade or business.

In resolving this issue it is helpful to note the abuse which Congress sought to prevent by the provision in question. Section 57 was originally enacted by the Tax Reform Act of 1969, Pub. L. 91–172, sec. 301, 83 Stat. 487, 581–583. At that time, Congress was concerned with abuses resulting from the prevalent use of borrowed money to purchase investment assets.[3] A congressional report described these abuses in the following terms:

The itemized deduction presently allowed individuals for interest, makes it possible for taxpayers to voluntarily incur substantial interest expenses on funds borrowed to acquire or carry investment assets. Where the interest

---

[3] A much publicized study of 154 high income individuals who paid little or no Federal income taxes found that 72 of these individuals benefited by deducting interest paid on loans taken to acquire growth stock and similar investments the gains on which would constitute capital gains. See H. Rept. 91–413 (Part I) (1969), 1969–3 C.B. 200, 246; 115 Cong. Rec. 22,563, 22,760 (Rep. Mills), 22,573 (Rep. Byrnes); Hearings on H.R. 13270 Before the Senate Comm. on Finance, 91st Cong., 1st Sess. 639–640 (1969) (Testimony of Hon. Edwin S. Cohen, Assistant Secretary of the Treasury for Tax Policy); A. Dixon, "Excess Investment Interest," 1 Tax Adviser 614 (1970). See also S. Rept. 91–552 (1969), 1969–3 C.B. 423, 495, 616–617; Hearings on H.R. 13270, *supra* at 576 (Testimony of Hon. Edwin S. Cohen).

expense exceeds the taxpayer's investment income, it, in effect, is used to insulate other income from taxation. For example a taxpayer may borrow substantial amounts to purchase stocks which have growth potential but which return small dividends currently. Despite the fact that the receipt of the income from the investment may be postponed (and may be capital gains), the taxpayer will receive a current deduction for the interest expense even though it is substantially in excess of the income from the investment. [H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 245.]

The original version of the Tax Reform Act of 1969 approved by the House contained a provision limiting individuals' current deductions for investment interest.[4] The Senate, acting chiefly in response to criticism of the House approach by the Treasury Department,[5] deleted the House provisions and added the parts of section 57 presently before us which made excess investment interest an item of tax preference. The Senate Report explained its reasons for these changes as follows:

The Treasury Department, however, recommended to the committee that the interest limitation be deleted pending further study. It noted that there is an abuse in this area which results from the possibility of acquiring growth property with borrowed funds, deducting the interest expense against ordinary income, and then treating the ultimate gain on the property as a capital gain. It believes, however, that the House provision did not correct many of the problems in this area. Particularly it expressed concern that the provision would affect the taxpayer who has only earned income more severely than an individual who also has investment income.

In view of this, the committee believes this provision of the House bill should be deleted pending further study of this problem. However, investment interest expense in excess of investment income is an item included in the base for the minimum tax on preference income which is provided in the committee amendments. [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 617.]

The Conference Committee restored the House provision limiting deductions for investment interest (with changes not relevant here), but only for years beginning after December 31, 1971. This provision is currently section 163(d). The Senate provision making excess investment interest an item of tax

---

[4]This provision contained the following definition of investment interest:

INVESTMENT INTEREST.—The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

This definition was adopted as the definition of investment interest for purposes of the sec. 163(d) deduction limitation on investment interest. Sec. 163(d)(3)(D). It is the same as the sec. 57(b)(2)(D) definition of investment interest expenses quoted previously.

[5]Hearings on H.R. 13270 Before the Senate Comm. on Finance, 91st Cong., 1st Sess., 576–577 (1969) (Testimony of Hon. Edwin S. Cohen, Assistant Secretary of the Treasury for Tax Policy).

preference was retained, but made applicable only to years beginning before January 1, 1972. Conf. Rept. 91–782 (1969), 1969–3 C.B. 644, 657–658, 659.

Thus, section 57, like section 163(d), attempts to deal with an abuse which is present whenever interest is incurred to obtain or maintain property held with sufficient investment intent for the gain on its disposition to constitute capital gain. Such property is investment property and the interest on funds borrowed to finance its purchase is investment interest. We, therefore, must look to the stock purchased by Milbro with the borrowed funds to determine whether the stock was held with sufficient investment intent to make it a capital asset.

In *W. W. Windle Co. v. Commissioner*, 65 T.C. 694, 714 n. 15 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977), this Court noted that "stock is normally a capital asset" owned for investment purposes,[6] and held that only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." Subsequently we applied this substantial investment intent test in *Continental Ill. Nat. Bank v. Commissioner*, 69 T.C 357 (1977), and in *Bell Fibre Products Corp. v. Commissioner*, T.C. Memo. 1977–42, appeal dismissed ___ F.2d ___ (7th Cir. 1977).[7] This test is also applicable here to determine whether the BNB stock was "held for investment." If the stock was held with sufficient investment intent to result in a capital gain upon its disposition, then the abuses resulting from the use of borrowed money to acquire capital assets, which Congress sought to prevent in enacting section 57, are present. Applying a different standard requiring a greater degree of investment intent for purposes of the minimum tax on tax preferences would frustrate congressional policy. The minimum tax would be inapplicable to a loan incurred to purchase property which, because of the owner's substantial investment intent, would produce capital gains upon disposition.

The extent to which investment rather than business oriented considerations motivated the purchase of BNB stock is an

---

[6]See also *Dearborn Co. v. United States*, 195 Ct. Cl. 219, 444 F.2d 1145, 1146–1147 (1971).

[7]A substantial motive test was applied by the Court of Claims in *Agway Inc. v. United States*, 207 Ct. Cl. 682, 524 F.2d 1194, 1201 (1975), and *Dearborn Co. v. United States, supra* at 1148. Contra *Union Pacific R. Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343 (1975), cert. denied 429 U.S. 827 (1976).

"essentially factual" question. *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 51 (1955). Since Milbro purchased and owned the stock, borrowed the money, and incurred the interest expense in question, we look to that partnership's motives. See sec. 1.702–1(b), Income Tax Regs.; *Podell v. Commissioner*, 55 T.C. 429 (1970); *Rosenthal v. Commissioner*, 48 T.C. 515 (1967), affd. 416 F.2d 491 (2d Cir. 1969). The weight of the evidence requires us to conclude that investment-oriented considerations constituted a substantial, and in fact, a dominant motive for the purchase and retention of BNB stock.

Milbro's Federal income tax partnership information returns list its principal business activity as investment, and it apparently believed its investment motive to be sufficiently significant to justify reporting its gains on sales of BNB stock as capital gains. Furthermore, Milbro reported the interest in question as a tax preference item under the heading for excess investment interest.

We are also persuaded that Milbro could reasonably expect a profit only from the eventual sale of the stock. It generated only $14,929 in 1970 from rents, commissions, and service fees, while incurring $65,428 interest and other expenses. Even after the $56,240 in BNB salaries contributed by petitioner and Earl is considered, Milbro's current return on its almost $900,000 worth of stock was marginal. By contrast, it received a profit of $751,622 in 1973 when it sold the stock.[8] This intent to realize a profit through the eventual sale of the property is indicative of an investment motive. See *Dearborn Co. v. United States*, 195 Ct. Cl. 219, 444 F.2d 1145 (1971).

We realize that payment of a premium price above market value has been noted as an indication that the stock was not held for investment purposes. Such premium makes it more unlikely that an eventual profit will be made upon resale and indicates a special need for the stock not shared with other investors. See *Dearborn Co. v. Commissioner, supra*. However, although Milbro

---

[8]Petitioner insists that we disregard the 1973 sale because it was necessitated by the failure of Prom Motor Hotels whose stock served as part of the security for the loan used to purchase BNB stock. However, petitioner presented no information as to whether the lending bank expressed concern over the failure of Prom Motor Hotels, what communications were received from the lender, whether the loan agreement required additional security, or any other details concerning this. Further, considering the rapid appreciation of the BNB stock, the liability of the partners for Milbro's debts, and petitioner's deposit of $100,000 as security, we find it doubtful that the lending bank would require the liquidation of the BNB stock or feel the security of its loan significantly threatened.

paid approximately 60 percent in excess of book value for the BNB stock, there is no indication that this constituted a premium above market value. As the sales by Milbro in 1970 and 1973 indicate, market value was consistently in excess of book value.

The evidence also indicates that BNB was run by petitioner, as president, and Milbro, as majority shareholder, so as to maximize its eventual resale value. Cf. *Rosenthal v. Commissioner, supra* at 530. During the period between 1969 when Milbro bought the majority of BNB's stock, and 1973 when it sold the stock, BNB's capital structure including both undivided profits and capital surplus increased from $875,000 to $1,300,000, and the value of BNB stock rose steadily as indicated by the sales made during 1969, 1970, and 1973. Yet, at least in 1970, petitioner reported only $6 of dividend income from BNB and Milbro reported no dividends. Petitioner also stated that his primary task as president was to seek new business for the bank thus enabling it to grow.

This emphasis on capital growth, coupled with the dim prospects for current net income, the sale in 1973, and Milbro's reporting of its interest expense and stock sale gains as excess investment interest and capital gains respectively, lead us to conclude that a substantial investment motive prompted the acquisition and retention of the BNB stock by Milbro. Indeed we believe the stock was purchased predominantly for investment motives.

The importance of the investment motives is also borne out by the motives of the individual partners. Undeniably, Earl's sole motive must be characterized as investment rather than business oriented. Petitioner admitted at trial that Earl possessed no interest in banking as such and invested solely to help in the financing. His lack of interest eventually resulted in his discharge from the vice presidency of BNB due to pressure from bank regulatory officials.

While petitioner undoubtedly had mixed business and investment motives, the preponderance of the evidence points to the significance (and, indeed, the dominance) of his investment motives. Petitioner's share of the partnership's liability on Milbro's loan exceeded $600,000. He personally gave $100,000 and his Prom Motor Hotels stock to be used as security for the loan, and his share of the 1970 partnership interest expense

totaled $50,087. By comparison to this large capital investment and current interest expense, his BNB salary for 1970 amounted to only $41,600. Such large disparity between capital investment and salary income indicates the importance of the investment motive. We find it unlikely that petitioner would risk such a large amount and incur substantial interest expenses for the salary he received.

Other factors also indicate the strength of his investment motive. Petitioner believed his investment motive to be sufficiently significant that he reported the gains from his sales of BNB stock in April 1970 as capital gains. We note that he purchased this stock in January 1969 (the same month Milbro began purchasing BNB stock). As previously noted, he apparently directed BNB's management policies while acting as its president towards capital growth. He also spent substantial amounts of time working for Miller Pontiac and received a $50,000 salary from it in 1970—a salary which exceeded that received from BNB. Furthermore, unlike several cases finding corporate stock to be noncapital assets under the *Corn Products* doctrine,[9] the purchase of BNB stock was consistent with petitioner's prior investments in banks, and was itself a good investment as evidenced by the sales to acquaintances of petitioner who he testified were interested in its investment potential and as also evidenced by the 1973 sales price received by Milbro. *Continental Ill. Nat. Bank v. Commissioner*, 69 T.C. 357 (1977).[10]

In opposition to our conclusion, petitioner presents two basic arguments. Petitioner argues that Milbro "was a qualified bank holding company from the time of its creation and was restricted" to ownership of stock in banks and bank holding companies and to providing services related to banking by the Bank Holding Company Act of 1956 (codified in 12 U.S.C. sec. 1841, et seq.). From this he concludes that Milbro was in the trade or business of banking and the stock was a necessary part of this business. Petitioner errs in three respects with this argument. Milbro, since it was a partnership, was specifically excluded from the definition of a bank holding company by 12

[9]See *Waterman, Largen & Co. v. United States*, 189 Ct. Cl. 364, 419 F.2d 845, 854 (1969), cert. denied 400 U.S. 869 (1970), and cases cited therein stressing the presence or absence of similar previous investments as a factor to be considered.
[10]See also *Datamation Services, Inc. v. Commissioner*, T.C. Memo. 1976–252.

U.S.C. section 1841(b) until its amendment by Pub. L. 91–607, 84 Stat. 1760, 1762. That amendment was not approved until December 31, 1970. Also, the Act does not automatically put bank holding companies in the business of banking for tax purposes. It is a strictly regulatory measure which permits the use of partnerships as vehicles for investment in qualified property—the use to which petitioner and Earl put Milbro. Cf. *Continental Ill. Nat. Bank v. Commissioner*, 69 T.C. 357 (1977). Finally, petitioner's argument fails to recognize the distinction between the ownership of stock in banks for investment, and the trade or business of banking.

Petitioner's second argument relies entirely upon a document prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance entitled "Summary of H.R. 13270, The Tax Reform Act of 1969 (As Passed by the House of Representatives)." In discussing the House provision limiting deductions for investment interest (noted *supra*) the report lists four arguments favoring its adoption and four against. As one of the reasons against adoption, the report states on page 45:

Additionally there are difficulties in distinguishing between investment interest and business interest which this provision may not adequately deal with. An example of this is the case where the taxpayer purchases 100 percent of the stock in a corporation. Although the limitation would appear to apply to this situation, it is questionable whether the purchase of the stock is made for investment purposes rather than for business purposes.

Petitioner contends that this proves that section 57 was never intended to cover purchases of controlling interests in companies. We disagree.

Initially we note that the report states on its cover: "NOTE.— This document has not been reviewed by the committee." It is not clear that committee ever focused on the report, or this aspect of the report. Even if they reviewed the matter, nothing in the statute or legislative history suggests that they considered it a problem, or proposed and adopted any solution.[11]

We also note that petitioner does not fall within the example

---

[11]Congress recently considered the applicability of the term "investment interest" to interest incurred on loans used to purchase controlling interests in corporations. Rather than excluding such interest entirely from the definition of investment interest for purposes of the sec. 163(d) limitation on the deductibility of investment interest, Congress chose merely to permit the deduction of an additional $15,000 of such interest. Tax Reform Act of 1976, Pub.L. 94–455, sec. 209, 90 Stat. 1525, 1542–1544 (codified in sec. 163(d)(7)).

in the report of a purchaser of 100 percent of a corporation's stock, but that even if he did, the report states that the proposed limitation on investment interest "would appear to apply." We therefore do not feel that the document is an appropriate part of the legislative history, or that even if it is, that it throws any light on the problem we confront.

In conclusion, we note that both petitioner and respondent have framed some of their arguments in reliance upon proposed regulation section 1.51–2(b) (35 Fed. Reg. 19766–19768 (Dec. 30, 1970), reproposed 36 Fed. Reg. 12023–12024 (June 24, 1971)). While we believe that our decision accords with section 1.51–2(b)(2)(i) of these proposed regulations, we do not rely upon it as authority since regulations which have not yet been formally adopted "carry no more weight than a position advanced on brief by the respondent." *F. W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1265–1266 (1970).

*Decision will be entered for the respondent.*