**Harry MARGOLIS and Ann Margolis, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. C–82–3188 SW.

United States District Court, N.D. California.

April 25, 1983.

Bruce Lopucki, Bruce Lopucki, P.C., San Jose, Cal., for plaintiffs.

Joseph P. Russoniello, U.S. Atty., Jay R. Weill, Asst. U.S. Atty., Chief, Tax Div., San Francisco, Cal., for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

### ORDER AND MEMORANDUM OF DECISION

Upon consideration of the motion, oral argument and submitted testimonial and documentary exhibits, IT IS HEREBY ORDERED THAT defendant's motion for summary judgment is GRANTED. The Court's reasoning in this matter is set out briefly below.

Oral arguments by counsel for both parties were heard on March 16, 1983 upon defendant's motion. Despite the inherently complicated web of transactions in which the plaintiff has routinely engaged, this Court has parsed the submitted tax returns and testimony of the plaintiff Harry Margolis, analyzing the relevant characteristics of these transactions in order to determine their tax consequences. We conclude that, even permitting reasonable inference most favorable to the plaintiffs opposing this motion, the uncontroverted facts establish that plaintiffs are not entitled to treat claimed interest payments as "ordinary and necessary" expenses incurred in one's "trade or business", and deductible on Schedule C. We do not decide at this time whether: (1) the claimed items represent *bona fide* "expenses"; (2) plaintiffs' various lending and borrowing activities with the Antigua Bank Limited ("ABL") constituted a commitment by the plaintiffs to engage in the "short term lending" business; or, (3) whether, if *bona fide,* the expenses were properly subject to the terms and conditions of Schedule A as "itemized deductions" or, on Form 4952, as "investment interest". For the purpose of this motion, we assume that the transactions which allegedly gave rise to

this indebtedness were at arms' length, the interest *bona fide* and the plaintiff Harry Margolis' contentions contained in his affidavit and depositions wholly true.

FACTS:

Although interesting, much of the complexity surrounding the contested deductions is irrelevant to the determination of the instant motion. The plaintiffs, husband and wife, contest the IRS's disallowance of their amended 1976 tax return; this amendment attempted to recharacterize certain interest expenditures under a different nomenclature within the Internal Revenue Code, subjecting them to more favorable tax treatment. For simplicity here, since Harry Margolis is the active party as concerns the couple's claimed deductions, this discussion will use the singular "plaintiff" to refer solely to him.

Plaintiff is an attorney practicing law in Los Gatos, California. For the tax year in question, plaintiff was the principal shareholder of the professional corporation Margolis, Chatzky & Dunnett, P.C., as well as a salaried employee of that corporation primarily engaged in the area of tax planning. Much of the plaintiff's law practice involved structuring various transactions between his clients and an "off-shore" bank, ABL. It is unnecessary to delve into the details of ABL's ownership or practices here; as stated above, we presume that ABL was a genuine lending institution which had contracted with plaintiff to act as a broker of loans, some of which indebted him to ABL for interest on the transaction.

Plaintiff claims that, along with reporting his "principal business" as that of an "ATTY" in 1976, he was also entitled to file an amendment to that return with a Schedule C stating as a second principal business that of "short term lending". We assume that plaintiff could consider himself so engaged in those two principal activities. However, to so characterize his activities, is to but begin the inquiry into the proper treatment of the interest incurred to ABL.

Quite simply, plaintiff testifies that his transactions on behalf of his firm's clients, employees and affiliates followed one of three patterns in 1976. In addition to paying plaintiff $25,442.31 in salary, ABL also paid the legal corporation a certain service fee to cover overhead, administrative costs of bookkeeping, *etc.*, and a percentage of lent monies. Plaintiff has testified that he "use(d) (his) accounts—sometimes, (his) trust account and the professional corporation and Anglo Dutch and A.B.L. as exchange accounts, depending upon the needs of the occasion." *Deposition of Harry Margolis*, taken January 24, 1983, *Exhibit 5 to Weill Affidavit in support of Defendant's Motion for Summary Judgment*, p. 8, lines 8–11.[1]

We need not speculate here as to the motivation for the borrowings, which are documented by plaintiff, his clients, and associates, nor dwell upon why the various forms of borrowing were used. For whatever the reasons, plaintiff, his brother, and clients and affiliates of the professional corporation borrowed monies "through" plaintiff in various patterns in 1976. We outline each of these patterns below, using whenever possible plaintiff's own testimony, and explore the tax consequences which result from each.

One form of borrowing was a reaction to a "policy" of the professional corporation "to keep personal loans out of the corporation". Thus, plaintiff explained that he "fought to have employees who wanted to borrow, borrow from Anglo Dutch or A.B.L.; (but that he) wasn't always successful". Thus, it appears that, in the bulk of instances, employees and clients borrowed directly from ABL. Plaintiff and the professional corporation, which was in 1976 owned by three attorneys, received "commission(s) or percentage(s)" of these loans. In these cases, plaintiff would presumably neither report interest expense or income, but would rather report any amounts received directly from ABL as income and

---

**1.** Where phrases appear in quotation marks throughout the exposition of the facts here, they are direct quotes of the plaintiff's testimony by depositions or declaration.

any dividends or salary from the corporation, whose net worth presumably reflected an increase as a result of these payments. The transactions which followed this pattern are not directly relevant to the deductions contested here; however, their existence would substantiate the existence of this second "principal" business that plaintiff claims to have conducted.

A second pattern of the loans involved plaintiff "act(ing) as clearance". This meant that, in "five to seven percent" of the cases, he borrowed directly from ABL, planning to immediately turn around to make a "stupid loan"—one where he could not "permit ABL to make (because he) could not approve the loan, but ... was willing to do it (personally)." Plaintiff does not specify the character of these borrowers who borrowed from ABL, using him as a conduit, but we assume that each was either a client or an affiliate of the professional corporation. This pattern incurred both interest expense and income, which plaintiff seeks to deduct any interest he paid on those loans, offset by any interest received on these loans. Although these loans made by plaintiff personally were at the same nominal rate at which he borrowed from ABL, interest received and paid did not "wash", giving rise to an excess of interest paid to ABL.

The third, and final, pattern that the loans between ABL and various affiliates of this professional corporation was slightly different from the second—but, as often is the consequence in tax law, form followed controls—with different tax implications. At the core of this controversy, plaintiff seeks to deduct any interest he paid ABL for monies he "would ... borrow from ABL (to) put ... in(to) the professional corporation; (with the) professional corporation ... pay(ing him) back with interest, and (he'd) pay ABL with interest". "Occasionally", and, in plaintiff's opinion, improperly, the corporation would borrow from ABL "directly". Plaintiff asserts that, but for "any few thousand dollars that (he) may have given a child or something of that sort ... (he) never used these large amounts for (his) personal use", and that the bulk of

these borrowings were to facilitate the corporation's transactions with its affiliates: clients, employees, *etc.*

Plaintiff asserts, and we presume, that "(he) did not intend to profit from the borrowing or lending of that money" as others in the "short-term lending business" would. This does not, however, mean that plaintiff disdained profit-making *in toto*. Plaintiff asserts vehemently that the brokerage of the loans was "to accommodate clients" of the law practice, that he did "want ... tax planning business" from these very beneficiaries of the loans. Whether or not, "having hundreds of thousands of dollars available directly and millions of dollars available indirectly", has indeed been "the lifeblood of (his) operation" is really not the crucial distinction as to the appropriate tax treatment for plaintiff's interest obligations. Similarly, whether the plaintiff borrowed and lent funds at the same nominal rate is not the key to determining whether plaintiff had the requisite motives to permit classification as "ordinary and necessary" expenses of a "trade or business".

Our analysis here must both glean what steps in the transactions are significant for tax purposes, as well as examine the evidence proffered by the parties, in the light most favorable to the plaintiff, for substantiation of any requisite subjective elements required under the I.R.C. provisions. *Mercer v. C.I.R.*, 376 F.2d 708, 710–711 (9th Cir.1967). We must respect form, but must not be misled by formalistic, *a priori* arguments which fall short of the rigor of tax analysis. Simply stated, our inquiry here is in three parts: (1) who, defined by form and function, was involved in the transactions; (2) what purpose, as evidenced by motive and result, were these transactions to serve; and, (3) what tax result flows from the transactions, after application of the standards found in I.R.C. § 162?

LAW:

In the bulk of instances, plaintiff neither borrowed, nor lent, money to clients or affiliates of the professional corporation.

Most often, plaintiff merely "screened" prospective borrowers for ABL, and the corporation only maintained the paperwork and documentation of the indebtedness. In these cases, plaintiff neither incurred, nor received any interest payments; here, compensation was directly paid to him by ABL in the form of a salary or commission and indirectly inured to his benefit by ABL's payments to the corporation, in the form of increased equity commanded by the shareholders of the corporation—plaintiff and his two co-owners.

In the remaining instances, plaintiff personally incurred indebtedness to ABL; he, in turn, lent virtually all the proceeds to clients and affiliates of the law practice either directly or via the corporation. In both cases, plaintiff would have this Court "look past" the corporate entity standing between himself and the eventual beneficiaries of the loans. While respecting the value of clients and affiliates to the success of the law practice, in the form of legal fees or services rendered, we cannot, *sua sponte,* disregard the corporate entity through which the plaintiff chose to practice in 1976. The extent to which the law corporation was the plaintiff's alter ego or a puppet of his will, as far as it is relevant here, merely distinguishes the authorities plaintiff cites to support his classifying these items on Schedule C. Plaintiff having "chosen to live by the corporate form" must bear its consequences, rather than, *sub silentio,* assail it as a "sham" *ex poste,* for perhaps poorly planned transactions in that tax year.

■ To the extent that the corporation was involved in these transactions, it should have reported any receipts and payments as "ordinary and necessary" expenses incurred in its "trade or business". Presumably, as a large shareholder, the plaintiff absorbed the effect of these transactions derivatively, by an increase or diminution in the value of his ownership. This "derivative", often symbiotic, relationship of shareholder/employee to corporation is the sine qua non of corporate taxation. Absent competent evidence to the contrary, courts will respect the legal person of the corporation, and preserve the formal separation between the affairs of the corporation and those of its shareholders/employees. This is particularly difficult, but correspondingly important, in the case of a closely-held and nearly singly-owned enterprise such as the one here; we may not cast the corporation aside as a "sham" when the sole justification offered by plaintiff for so doing is relatively more favorable personal tax treatment.

It does not demand a tremendous leap of faith for us to accept the plaintiff's assertion that the loans, regardless of form, were undertaken as an aspect of his corporation's ongoing tax practice. Although plaintiff disavows any profit motive from the loans *qua* loans, we note that he both drew a salary from, and owned an equity interest in, the professional corporation for whom these transactions were arguably an "integral part" of its practice. However, plaintiff acknowledges that the individuals for whom his personal indebtedness was incurred were clients and affiliates of the corporation, as opposed to his personally. Regardless of the stake in the corporation that the plaintiff held, or his good faith entry into the loans as an ancillary aspect of a profitable law practice, the Court will not "hopscotch" past the corporation wedged between the plaintiff and the ultimate beneficiaries of the loans.

■ Consequences of the plaintiff's choice to practice law as a professional corporation, as opposed to as a partnership or sole practice, are many—only two of which require discussion at the case at bar. First, as affects the plaintiff here, a shareholder's expenditures on behalf of his corporation are not regarded as for "trade or business", but as a form of further investment with the aim of enhancing the profitability of the corporation. Second, the immediate impact of corporate activities is reflected first upon its own tax reporting; in many instances, the corporate entity "absorbs" and passes slightly altered tax consequences to its affiliates.

■ As the United States Supreme Court has held,

Devoting one's time and energies to the affairs of a corporation is not of itself and without more, a trade or business of the person so engaged. ( . . . ) Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

*Whipple v. C.I.R.*, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963). In *Whipple*, the taxpayer owned controlling interests in, and managed several distinct, although interrelated, partnerships and corporations. He sought to write off a personal loan to one of the corporations as a business bad debt. The Supreme Court rejected this characterization, implicitly re-affirming the sanctity of a corporation's own business from a controlling shareholder's attempts to enhance his personal tax position by blurring the line separating the corporation and the shareholder. *Id.*, at 201, n. 9, 83 S.Ct. at 1173, n. 9. The *Whipple* case is sound precedent upon which this Court may hold, as a matter of law, that any benefits to the professional corporation of the lending arrangement in which the plaintiff presumably played a major part, cannot be used by the plaintiff personally to justify treating the interest incurred by him to ABL as in a "trade or business".

This Court finds plaintiff's reliance upon *Trent v. C.I.R.*, 291 F.2d 669, 674 (2d Cir. 1961) inapposite. *Trent* involved a corporate employee, not a controlling shareholder/employee, who was told "that he would be expected to make loans to the companies until their cash conditions improved", as a condition to his investment and employment by one of the affiliated corporations. *Id.* at 670. When, after being fired for refusing to make further loans, he demanded repayment of the loans and was refused, the taxpayer sought to classify the bad debt as incurred in his "trade or business". We could venture the myriad of substantial factual distinctions between *Trent* and the case at bar, but the most eloquent summarization of the rule and rationale applicable to this case springs from *Trent* itself. Judge Friendly, in his characteristically lucid and meticulous fashion, staked out the boundaries of the Circuit's holding in *Trent:* what is the character of loans made by a corporate employee in connection with retaining employment? *Id.* at 675. *See, e.g., Berwind v. C.I.R.*, 211 F.2d 575 (3d Cir.1954), for treatment where employment is not contingent on expense. Nothing here suggests that the plaintiff, as the controlling shareholder of a corporation, was compelled as a condition to his continued employment with that corporation to borrow on behalf of its clients and affiliates. His voluntary assumption of this practice during the 1976 tax year cannot now be cast as "compelled" or "coerced"; acceptance of such a bootstrapped argument here would explode the already fragile wall separating closely held professional corporations and their owners. As plaintiff hoped to sow as an employee/shareholder of Margolis, Chatzky & Dunnett, P.C., so he must reap.

However, since for the purposes of this motion for summary judgment we must accept plaintiff's averments as true, we cannot at this junction hold, as a matter of law, that the requisite "profit motive" behind the lending was absent. Nor do we determine what the appropriate tax treatment of the plaintiff's claimed expenses was in 1976, or is now. By granting this motion for summary judgment, we hold that the plaintiff is not entitled to deduct the claimed interest expenses as "ordinary and necessary" business expenses incurred in the business of "short-term lending", and do not pass upon whether the interest is properly claimed as "investment interest", or was appropriate as "nonbusiness" itemized deductions on Schedule A.

IT IS SO ORDERED.