HIROTOSHI YAMAMOTO AND SHIZUKO YAMAMOTO, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yamamoto v. Commissioner
Docket No. 29006-81.
United States Tax Court
T.C. Memo 1986-316; 1986 Tax Ct. Memo LEXIS 290; 51 T.C.M. (CCH) 1560; T.C.M. (RIA) 86316; July 28, 1986. Hirotoshi Yamamoto, pro se. Henry E. O'Neill, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1978
$77,684.88
1979
82,659.55
The issues for *292 decision are: (1) whether interest petitioners paid during 1978 and 1979 was "investment interest" as defined in section 163(d)[1]; (2) whether petitioners' transfer of property to a corporation qualifies for non-recognition treatment under section 351; and (3) whether the gain petitioners realized from the sale of two houses represents ordinary income. FINDINGS OF FACT Most of the facts have been stipulated and are so found. Hirotoshi and Shizuko Yamamoto (petitioners) resided in Honolulu, Hawaii, when they filed their petition in this case. They filed joint Federal income tax returns for the years 1978 and 1979. Hirotoshi Yamamoto, (hereinafter referred to individually as petitioner) owned stock in three corporations: Manoa Finance Company, Manoa Investment Company, and Manoa Enterprises, Inc. Manoa Finance Company (MFC) was in industrial loan company incorporated under the laws of the State of Hawaii in 1961. Until 1977, petitioner owned all of MFC's common stock, and was one of several owners of MFC's non-voting preferred *293 stock. Industrial loan companies in Hawaii such as MFC make loans and issue interest-bearing thrift certificates to savers. The State of Hawaii closely regulates industrial loan companies, and in particular prohibits industrial loan companies from having outstanding at any time debentures or loan certificates in excess of 10 times the amount of paid up capital and surplus. Hawaii Rev. Stat. sec. 408-14 (1976). The volume of MFC's business expanded during the period between 1961 and 1977, and therefore MFC needed constant increases in equity capital to maintain the debt to capital ratio required by the State of Hawaii. Petitioner purchased considerable amounts of common stock in MFC during this period in order to provide the company with the amount of equity required by State law. The following is a summary of the value of common stock held by petitioner during this period. 1961-62
$ 125,000
1963
229,500
1964
404,670
1965
656,170
1966
817,170
1967
1,216,550
1968
1,561,050
1969
1,614,050
1970
2,008,550
1971
2,305,300
1972-76
2,780,300
August/1977
2,830,300
In order to pay for the common stock he purchased during this period, and for preferred *294 stock he purchased after the summer of 1977, petitioner incurred a substantial number of loans. In addition, he incurred loans whose proceeds were stipulated to have been put to "business uses," or used to purchase "other investment property," or "net lease property." The parties have agreed upon the proper amounts allocable to each of these uses, and it is only with respect to the tax consequences of loan proceeds used to purchase stock in MFC that the parties disagree. MFC at various times loaned money to Manoa Investment Company (MIC), whose shares were held in their entirety by petitioner. MIC would, in turn, lend money to petitioner. As of December 31, 1975, petitioner owed $960,090.50 to MIC, resulting from advances made between February 8, 1965 and December 31, 1975. On at least one occasion, petitioner used proceeds of a loan from an unrelated finance company in order to repay a loan obtained from MIC. The proceeds of the MIC loan were originally used to purchase additional stock in MFC in order to satisfy the State requirement for minimum capital. In 1983, the State of Hawaii put MFC into receivership for allegedly failing to satisfy the required debt to capital ratio.
*295 On their 1978 and 1979 Federal Income tax returns, petitioners claimed interest deductions in the amounts set forth below: 1978
1979
Interest deducted on Schedule
[2] $185,773.93
$167,883
C as an expense of petitioner's
proprietorship
contracting business
Petitioners' distributive
90,420.00
72,412
share of interest deducted
on Schedule E by joint venture
of Takahashi and Yamamoto
Totals
$276,193.93
$240,295
After an audit of petitioners' 1978 and 1979 Federal income tax returns, the examining agent determined that the proceeds of many of the loans had been used to purchase stock in MFC, and that interest payments on those loans represented investment interest expense subject to the limitations of section 163(d). The dates on which the loans were incurred are relevant to determining the extent of limitations imposed by section 163(d). Some of the loans originated prior to December 17, 1969, others originated after December 16, 1969 but before September 11, 1975, and a third group originated after September 10, 1975. Some of the loans were *296 refinanced after September 10, 1975, and some of the loans were made in exchange for unsecured demand notes. In 1977, petitioner organized Manoa Enterprises, Inc. (MEI) and became its sole shareholder. He then exchanged his shares of MFC common stock for $1 million worth of common stock in MEI, plus an account receivable in the amount of $1,830,300. The State of Hawaii objected to this transaction and ordered its reversal. Petitioner failed to take any action with respect to the State's objections. In 1978, petitioners held non-voting preferred stock in MFC worth $715,000. Other shareholders' combined holdings of non-voting preferred stock amounted to $387,500. Petitioners thus held approximately 62 percent of the value of the non-voting preferred stock. In 1978, petitioners transferred to MFC a rooming house which they had purchased in 1955. Petitioners' basis in the rooming house was $10,833.39. At the time, petitioners valued the property at $150,000. It was subject to liabilities in the amount of $111,493.52. MFC subsequently sold the property in 1978 for $180,000. On April 24, 1978, petitioners acquired 6,585 shares of non-voting preferred stock in MFC for $38,500. *297 On April 25, 1978, petitioners received a check from MFC in the amount of $38,506.48, representing the difference between the $150,000 value of the rooming house and $111,493.52 of liabilities assumed. Petitioners claim that the transfer of the rooming house to MFC in exchange for stock qualifies for non-recognition under section 351. Petitioner was a general partner in Waianae Associates. In 1960, Waianae Associates purchased a 300-acre tract of land in Waianae, Hawaii, and subsequently sold 25-acre parcels to different developers. Some of the developers borrowed money from MFC to develop the parcels. One developer was unable to complete the project. In order to facilitate construction and to insure payment to MFC, petitioner constructed seven homes on seven separate lots. Five of the homes were sold after construction was complete. Petitioner reported the gain from these sales as ordinary income. Construction of the two unsold houses was completed in May of 1973. They were immediately listed with Manoa Realty, petitioners' proprietorship business, for sale through Multiple Listing Service. Due to a depressed real estate market at the time, however, the properties could *298 not be sold for the price asked. In 1974, the property was listed for another year with Multiple Listing Service. The listing was not renewed in 1975. In 1975, petitioner concluded that he would be unable to sell the houses while the real estate market remained depressed. He decided to rent the houses instead. During the period from 1975 through 1978, petitioner did not install a "For Sale" sign on the property, and he did not list the houses with a sales agency. In 1978, a buyer approached him and ultimately purchased both houses for $127,000. Petitioners reported the gain as long-term capital gain. OPINION Issue 1. Claimed Deductions for Interest on Loans.
MFC needed additional equity in order to meet Hawaii's required equity to debt ratio. Petitioner incurred personal loans in order to increase MFC's capital account, and took back stock in exchange for the loan proceeds. He claimed deductions on his Federal income tax returns for the amounts he paid as interest on the loans. Respondent contends that the interest constitutes "investment interest" and thus is subject to the limitations of section 163(d). Petitioner contends that the stock was not acquired with *299 investment motives, but rather was acquired in order to help MFC to meet the requirements of State law, and hence for trade or business purposes. Section 163(d) limits the deduction of "investment interest" to $10,000 plus certain additional amounts. The term "investment interest" is defined as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." Section 163(d)(3)(D). Legislative history makes it clear that interest on funds borrowed for use in connection with a trade or business is not affected. H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 246. Compare section 57(b)(2)(D) prior to amendment by the Tax Reform Act of 1976, Pub. L. 94-455, section 301(c)(2)(f), (g), 90 Stat. 1549. [3]
*300 The issue, therefore, is whether petitioner acquired and retained additional stock in MFC for investment or business purposes. If the stock was held with sufficient investment intent to result in a capital gain or loss upon its disposition, then interest paid on a loan to acquire the stock is investment interest. See Miller v. Commissioner,70 T.C. 448, 455, (1978).[4] As we stated in Miller v. Commissioner,supra at 455: In W.W. Windle Co. v. Commissioner,65 T.C. 694, 714 n. 15 (1976) * * * this Court noted that "stock is normally a capital asset" owned for investment purposes, and held that only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." * * * This test is also applicable here to determine whether the BNB stock was "held for investment." If the stock was held with sufficient investment intent to result in a capital gain upon its disposition, then the abuses resulting from the use of borrowed money to acquire capital assets, which Congress sought to prevent in enacting section 57, are *301 present. Applying a different standard requiring a greater degree of investment intent * * * would frustrate congressional policy. The minimum tax would be inapplicable to a loan incurred to purchase property which, because of the owner's substantial investment intent, would produce capital gains upon disposition. [Fn. ref. omitted.] Thus, only where both the original purpose of the acquisition and the reason for continued retention are "devoid of substantial investment intent" will the stock be considered to have been held for purposes other than investment. Miller v. Commissioner,supra;Continental Ill. Nat. Bank v. Commissioner,69 T.C. 357 (1977); *302 W.W. Windle Co. v. Commissioner,65 T.C. 694, 714 n. 15 (1976). Whether petitioner acquired and retained the stock in MFC without substantial investment intent is essentially a factual question. See Corn Products Refining Co. v. Commissioner,350 U.S. 46, 51 (1955); Miller v. Commissioner,supra at 456. The parties have stipulated that petitioner purchased stock in order to enable MFC to maintain the State-required level of capital. Petitioner argues that interest paid to purchase stock acquired as part of "an active, life or death struggle for the survival of the corporation" should not be construed as investment interest. Respondent replies that "[t]he corporation's business purpose for requiring funds does not transcend the corporate entity." Petitioner is correct in stating that, in some circumstances, securities may be acquired for business purposes without substantial investment intent. E.g., Commissioner v. Bagley & Sewall,221 F.2d 944 (2d Cir. 1955), affg. 20 T.C. 983 (1953); Enoch v. Commissioner,57 T.C. 781 (1972). *303 Thus, courts have held that a corporation in the business of manufacturing corn products acquired corn futures contracts as an integral part of its manufacturing business, Corn Products Refining Co. v. Commissioner,supra; that a corporation acquired bonds as means to secure contract delivery and without investment intent, Commissioner v. Bagley & Sewall,supra; and that bonds purchased to meet FHA loan reserve requirements were integrally related to the business of a corporation that owned an apartment complex, Enoch v. Commissioner,supra.
Respondent, however, is also correct in stating that the trade or business of a corporation is not necessarily the trade or business of its shareholder. As the Supreme Court has stated: "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." Whipple v. Commissioner,373 U.S. 193, 202 (1963). Beginning with this premise, courts have frequently denied to shareholders deductions *304 related to expenditures they had made on behalf of their corporations. E.g., Perlman v. Commissioner,27 T.C. 755 (1957), affd. 252 F.2d 890 (2d Cir. 1958); Eskimo Pie Corporation v. Commissioner,4 T.C. 669 (1945), affd. 153 F.2d 301 (3d Cir. 1946); Margolis v. United States,570 F. Supp. 170 (N.D. Cal. 1983). We held in Perlman v. Commissioner,supra, that a shareholder's cancellation of his corporation's debt to him was not a business loss or expense, even though it was made necessary because the corporation's "capital and surplus account was far too low in relation to the amount of premiums written, and there was danger that the State insurance authorities might take action that would cripple the company." Perlman v. Commissioner,supra at 758. The troubled corporation in Perlman was in a situation similar to that of MFC. The shareholder forced to aid the corporation in Perlman was not deemed to have incurred a loss in his own trade or business; likewise, petitioner in the instant case cannot adopt the corporation's trade or business as his own *305 to escape the limitations of section 163(d). See also Miller v. Commissioner,70 T.C. at 459 n. 11. Accordingly, we conclude that the interest paid on loans incurred to purchase stock constitutes investment interest under section 163(d). Two effective date rules apply to section 163(d). As originally enacted by the Tax Reform Act of 1969, section 163(d) applies only with respect to taxable years beginning after December 31, 1971. Pub. L. 91-172, section 221(a), 83 Stat. 574. Section 163(d)(5), however, provides the following transition rule: This subsection shall not apply with respect to investment interest, investment income, and investment expenses attributable to a specific item of property, if the indebtedness with respect to such property -- (A) is for a specified term, and (B) was incurred before December 17, 1969, or is incurred after December 16, 1969, pursuant to a written contract or commitment which, on such date and at all times thereafter prior to the incurring *306 of such indebtedness, is binding on the taxpayer. The second effective date rule was added in the Tax Reform Act of 1976. In general, the 1976 amendments apply to interest deducted in taxable years beginning after December 31, 1975. Pub. L. 94-455, section 209(b)(1), 90 Stat. 1543. The amendments do not, however, apply as follows: (b) EFFECTIVE DATE. -- * * * (2) INDEBTEDNESS INCURRED BEFORE SEPTEMBER 11, 1975. -- In the case of indebtedness attributable to a specific item of property which -- (A) is for a specified term, and (B) was incurred before September 11, 1975, or is incurred after September 10, 1975, pursuant to a written contract or commitment which on September 11, 1975, and at all times thereafter before the incurring of such indebtedness, is binding on the taxpayer, the amendments made by this section shall not apply, but section 163(d) of the Internal Revenue Code of 1954 (as in effect before the enactment of this Act) shall apply. * * * [Pub. L. 94-455, section 209(b)(2), 90 Stat. 1543.] Although petitioners did not raise this point *307 in the pleadings, at trial or in their briefs, respondent has informed us that petitioners object to treating interest on unsecured demand notes and refinanced loans from periods preceding December 16, 1969, and September 10, 1975 as loans made after those dates. Petitioners have nowhere alluded to this argument. The record contains no evidence describing the "unsecured demand notes" or the "refinanced loans." Respondent states that he can find no cases discussing these issues. We are unable to consider adequately these important issues without evidence of the refinancing agreement, without argument by petitioner on brief or at trial, and without mention of the issue in the pleadings. Petitioners have met neither their burden of going forward with evidence nor their burden of proof. Rules 34(b)(4), (5) and 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933); Helvering v. Taylor,293 U.S. 507 (1935). Issue 2. Treatment of Transfer of Rooming House to MFC in Exchange for Stock.
Until 1977, petitioner owned all of the common stock of MFC. In 1977, in a transaction not at issue in this case, petitioner *308 transferred all of MFC's common stock to MEI, a newly organized corporation in which he was the sole shareholder. In 1978, petitioners held approximately 62 percent of the value of MFC's non-voting preferred stock. [5]
In 1978, petitioners transferred to MFC a rooming house which they had purchased in 1955. Petitioners' basis in the rooming house was $10,833.39. Petitioners valued the property at the time of the transfer at $150,000. The property was subject to liabilities in the amount of $111,493.52. On April 24, 1978, petitioners paid to MFC $38,500 in exchange for 6,585 shares of non-voting preferred MFC stock. On April 25, 1978, petitioners received a check from MFC in the amount of $38,506.48, representing the difference between the $150,000 value of the rooming house and the $111,493.52 of liabilities to which the property was subject. Petitioners contend that the transfer of the rooming house to MFC in exchange for stock qualifies for non-recognition under section 351. Respondent's position is *309 that petitioners failed to meet the "control" requirements of section 351, and thus that the transaction should be treated as a sale. In the alternative, respondent argues that, even if section 351 applies, gain should be recognized to the extent that the liabilities assumed by the corporation exceed petitioners' basis in the property. We find that petitioners have failed to meet the section 351 control test. Section 351(a) provides that: No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. * * * Section 368(c) defines "control" as: [T]he ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. Petitioner admits that immediately after he contributed the rooming house to MFC, *310 MEI held all of MFC's voting stock. Petitioner argues, however, that MEI's holdings should be attributed to him, through section 318, since he held 100 percent of MEI's stock. Section 318 attributes a proportionate share of the stock held by a corporation to its shareholders who hold 50 percent or more of its stock. Section 318 applies, however, only "[f]or purposes of those provisions of this subchapter [Subchapter C] to which the rules contained in this section are expressly made applicable." Section 318(a). Neither section 368(c) nor section 351 state that the attribution rules of section 318 apply. This Court has previously held that section 318 does not apply for purposes of determining control under section 351. Berghash v. Commissioner,43 T.C. 743 (1965), affd. 361 F.2d 257 (2d Cir. 1966). In addition, the stipulation establishes that petitioners held only approximately 62 percent of MFC's non-voting preferred stock immediately after the exchange. Petitioners therefore fail to satisfy both prongs of the control test. In view of our holding that section 351 does not apply, we find it unnecessary to address respondent's alternative *311 argument that even if section 351 were to apply, petitioners would be taxable to the extent the rooming house was subject to liabilities in excess of their basis. [6]
Issue 3. Character of Gain from Sale of Houses.
MFC loaned money to various developers of real estate. When one of the developers was unable to complete development of a project, petitioner decided to facilitate construction (and payment to MFC) by building seven homes himself. Five of the homes were sold after construction was complete, and petitioner reported the gain from their sale as ordinary income. The two remaining homes were listed for sale for 2 years, but were not sold. In 1975, *312 petitioner decided to hold the houses for rental while the real estate market remained depressed. From 1975 through 1978, he rented the properties to tenants. He did not install a sign on the properties indicating that they were being offered for sale, and he did not list the houses with a sales agency. In 1978, a buyer approached him, and ultimately purchased both houses. Petitioner reported the gain as long-term capital gain. Respondent argues that petitioner held the properties primarily for sale to customers in the ordinary course of his trade or business. Section 1221. Petitioners contend that, beginning in 1975, they held the properties for investment. We agree with petitioners. Whether realty is held for investment is an inherently factual question. Estate of Freeland v. Commissioner,393 F.2d 573 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. Property acquired for one purpose may be held subsequently with a different intention. Biedenharn Realty Co., Inc. v. United States,526 F.2d 409 (5th Cir. 1976). Here petitioner admits that he originally acquired the property intending to sell it to customers as a real estate *313 developer. When he was unable to sell two of the homes, however, he decided to abandon his effort at sales. He took active steps which serve as evidence of his changed intentions, by removing the homes from agency listings, and by failing to maintain a "For Sale" on the property. During the 3 years preceding the sale, the homes in question were not held for sale to customers in the ordinary course of petitioner's trade or business, and the gain on eventual sale of the property is therefore capital in nature. To reflect our conclusions with respect to the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The stipulation, apparently due to a typographical error, reports this figure at $185,733.93.↩
3. Sec. 57 treated "excess investment interest" as an item of tax preference. Sec. 57(b)(2)(D) defined "investment interest expense" as follows: (D) INVESTMENT INTEREST EXPENSE. -- The term "investment interest expense" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. For purposes of the preceding sentence, interest paid or accrued on indebtedness incurred or continued in the construction of property to be used in a trade or business shall not be treated as an investment interest expense.↩
4. The issue in Miller v. Commissioner,70 T.C. 448 (1978), was whether a loan incurred to purchase stock inolved "investment interest expense" for purposes of former sec. 57(b)(2)(D), involving the minimum tax on items of tax preference. The similarities between former sec. 57(b)(2)(D) and the definition of investment interest in sec. 163(d)(3)(D) make our reasoning in Miller v. Commissioner,supra, applicable to the instant case. See Miller v. Commissioner,supra↩ at 454-455 and n. 4.
5. We assume in this discussion that petitioners held 62 percent of the value of non-voting preferred stock immediately after the 1978 transaction discussed infra.↩
6. With respect to this claim, petitioners argued that they should not be treated as having received "boot" when MFC took the property subject to a mortgage because they were never personally liable on the mortgage. We note, however, that petitioners' basis in the property should have included the non-recourse liabilities to which the property was subject. Crane v. Commissioner,331 U.S. 1↩ (1947). We assume that their stipulated basis of $10,833.39 had been adjusted for depreciation since 1955.