GARY H. DRIGGS AND KAY T. DRIGGS, ET AL.,[1]
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 12206-82, 21103-82,  Filed September 30, 1986.
29718-84, 29719-84.

*K. Layne Morrill, Leo R. Beus,* and *Robert C. VanVoorhees,* for the petitioners.
*Martha J. Combellick,* for the respondent.

GERBER, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioners | Years | Income Tax deficiencies | Docket No. |
|---|---|---|---|
| Gary H. and Kay T. Driggs | 1978 | $57,280.52 | 12206-82 |
|  | 1979 | 95,879.69 |  |
|  | 1980 | 38,974.16 |  |
| Douglas H. and Effie K. Driggs | 1978 | 20,464.43 | 12206-82 |
|  | 1979 | 38,566.39 |  |
|  | 1980 | 22,155.09 |  |

[1]Cases of the following petitioners are consolidated herewith: Gary H. Driggs and Kay T. Driggs, Douglas H. Driggs and Effie K. Driggs, John D. Driggs and Gail D. Driggs, docket No. 12206-82; Leo A. and Shirley A. Weidner, docket No. 21103-82; Kathryn A. Mullikin, docket No. 29718-84; and Howard M. Snyder and Virginia Snyder, docket No. 29719-84.

| Petitioners | Years | Income Tax deficiencies | Docket No. |
|---|---|---|---|
| John D. and Gail D. Driggs | 1978 | 19,677.97 | 12206-82 |
| | 1979 | 52,654.41 | |
| | 1980 | 40,448.92 | |
| Leo A. and Shirley A. Weidner | 1977 | 6,712.00 | 21103-82 |
| | 1979 | 24,704.55 | |
| Kathryn A. Mullikin | 1980 | 63,263.00 | 29718-84 |
| Howard M. and Virginia Snyder | 1980 | 26,545.68 | 29719-84 |

The above-listed cases have been consolidated for purposes of trial, briefing, and opinion. Petitioners are related by their common interest in a partnership which engaged in a transaction that generated the claimed tax benefits being questioned by respondent. With one exception,[2] all other unrelated issues contained in the respective statutory notices have been settled or resolved by the parties. The remaining issues concern the acquisition of a 20-year license to market a computerized translation system known as the "Span-Eng System." The controversy centers on the use and interpretation of section 1253,[3] concerning the amortization of license fees, and section 709, concerning whether other fees are deductible or to be capitalized.

More specifically, the issues presented are: (1) Whether nonrecourse notes constitute "contingent payments" within the meaning of section 1253(d)(1); (2) whether "payments" by means of nonrecourse indebtedness are to be considered part of the "principal sum" within the meaning of section 1253(d)(2); (3) whether the nonrecourse indebtedness is too speculative and contingent to be recognized and whether it lacks economic significance in relation to the value of the underlying asset(s); and (4) whether amounts paid to a general partner as "sponsor's fees" are deductible expenditures or syndication costs which are to be capitalized.

---

[2]The parties are attempting to work out an agreement to be bound by the outcome of a group of cases being considered by another judge with respect to a common issue involving CSA-BL 1977 Leasing for petitioners Gary H. and Kay T. Driggs' 1978 and 1979 taxable years in docket No. 12206-82.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.

## FINDINGS OF FACT

Some of the facts in this case have been stipulated by the parties and their stipulations and attached exhibits are incorporated by this reference. All of the petitioners in docket No. 12206-82 resided in Arizona at the time of the filing of their petition. Petitioners Weidner (docket No. 21103-82) resided in Utah at the time of filing their petition. Petitioners Mullikin (docket No. 29718-84) and Snyder (docket No. 29719-84) resided in California at the time of filing their petitions.

### *General Background*

Each of the petitioners purchased limited partnership interests in Span-Eng Associates (Partnership), a Utah partnership formed on October 1, 1979. Partnership's purpose was to acquire a license, market, sell, and service Span-Eng Systems (System). System is computer software which provides computer-assisted language translation of Spanish to English and English to Spanish by means of a "DEC 11/34" mini-computer and word processor. System was originally developed by Weidner Communications Systems, Inc. (Communications), incorporated on July 28, 1977, in Utah by petitioner Leo A. Weidner's relatives, Bruce and Stephen Weidner, and Carter Jones, Jr. Petitioner Leo A. Weidner was named a director and vice president of Communications. Communications initially employed the technical know-how of the System's innovator, Inns of the Temple, Inc., an institution run by Bruce Wydner (brother of Stephen Weidner, 100-percent shareholder of Communications).

Communications also worked with Eyring Research Institute of Provo, Utah, in furthering development of System. Communications had slightly more than $400,000 in working capital available during the time of System's development. Communications' financial statements reflect $89,013 in accumulated research assets, and $183,047 in accumulated research and development expense, through March 31, 1979. Communications, on June 18, 1979, agreed to pay $20,000 to Inns of the Temple, Inc., for its interest in System.

Weidner Marketing, Inc. (Marketing), was incorporated in Utah on September 28, 1979, as Communications' wholly owned subsidiary and marketing arm. Span-Eng Associates (Partnership), was formed to provide funding for Communications' activities in producing and marketing System. Alta Communications, Inc. (Alta), originally incorporated in Utah on December 4, 1978, was to be the general partner of Partnership and was controlled by Stephen Weidner.

## Span-Eng Associates (Partnership)

Alta promoted the sale of limited partnership interests by means of a private placement memorandum, dated July 6, 1979. Alta was to receive 10 percent of the total proceeds ($6,160,000) of the offering as a "sponsor's fee." The $616,000, was to be paid in $308,000 installments during 1979 and 1980. Alta was paid "sponsor's fees" of $308,000 during 1979 and $188,900 during 1980. Walker Bank & Trust offered financing terms whereby prospective limited partners could borrow 75 percent of the required cash investment with recourse evidence of indebtedness. Petitioners each invested in Partnership and claimed losses as follows:

| Investor-petitioner's name | Total cash investment | Amount paid in 1979 | Amount paid in 1980 | Losses claimed as attributable to partnership | |
| --- | --- | --- | --- | --- | --- |
| | | | | 1979 | 1980 |
| Gary and Kay Driggs | $176,000 | $88,000 | $88,000 | $82,781 | $71,309 |
| Douglas and Effie Driggs | 88,000 | 44,000 | 44,000 | 41,391 | 35,655 |
| John and Gail Driggs | 176,000 | 88,000 | 88,000 | 82,781 | 71,309 |
| Leo and Shirley Weidner | 88,000 | 88,000 | - - - | 82,781 | - - - |
| Howard and Virginia Snyder | 88,000 | - - - | 88,000 | - - - | 75,673 |
| Kathryn Mullikin | 88,000 | - - - | 88,000 | - - - | 75,688 |

The private placement memorandum offered 35 partnership units at $176,000 each[4] to raise $6,160,000 total proceeds from the offering. As of October 1, 1979, 18 of the $176,000 units of Partnership remained unsold. Through a corporate entity named Nokomis, Inc., Stephen Weidner purchased the 18 unsold units with funds borrowed from Walker Bank & Trust. Between October 1, 1979, and December 31, 1979,

---

[4]Although each unit was offered for $176,000, investors were permitted to purchase an $88,000 one-half unit which was the minimum cash investment offered.

11.5 of the 18 "Nokomis units" were resold to unrelated investors. The apparent purpose of the October 1, 1979, "Nokomis transaction" was to close the offering and accomplish full funding, thus enabling Partnership to meet its commitments.

## The License Agreement

Partnership and Communications entered into an October 1, 1979, agreement granting to Partnership the exclusive domestic rights to promote, distribute, and market System for 20 years in exchange for a stated consideration of $13,200,000. The $13,200,000 was to be paid as follows: (1) $2,600,000 to Communications in cash on October 1, 1979, and April 1, 1980. (2) $1 million to Communications each year beginning 1985 through 1992, which at Partnership's option could be satisfied each year by means of a nonrecourse note. The nonrecourse notes would have been secured only by the assets of Partnership, including proceeds of sales of System. (3) 10 percent of gross sales to Communications to the extent that 10 percent of gross sales exceeded the two $2,600,000 cash payments and "cash or actual" payments on any of the nonrecourse notes.

Partnership could terminate the license agreement upon 30 days' notice, so long as termination was not conditioned upon Communications' default. Presumably, Partnership's termination of the license without cause would not entitle Partnership to any return of its cash payments.

Partnership paid Communications $2,600,000 for license fees on October 1, 1979. During 1980, Partnership "paid" Communications $2,326,560 for license fees composed of $1,225,560 paid directly to Communications, $66,000 paid indirectly through credit entries at Walker Bank & Trust, and $1,035,000 paid to Marketing at Communications' direction. No other license fees payments were ever made by Partnership and the license agreement was terminated in 1982.

## The Sales Agency Agreement

On October 1, 1979, Partnership and Marketing entered into a "Sales Agency Agreement" wherein Marketing be-

came the exclusive domestic selling agent of Partnership. Marketing was to receive 15 percent of the gross selling price of each System. The sales agency agreement was to expire on December 31, 1980. System was to sell for $155,000 per unit composed of the translation software and hardware (a mini-computer). The hardware portion of System represented less than $100,000 of System's cost. Very few sales of System occurred during the 15-month sales agency agreement period.[5]

Partnership was to acquire each translation system from Communications at a 35-percent discount from the gross selling price. Essentially, Partnership's return was 20 percent of the gross selling price of System (35-percent discount less 15-percent sales agency agreement commissions). Prior to October 1, 1979, limited advertising and product exposure of System was accomplished by Communications. System was shown at the American Translators Association's fall 1978 convention in New York City. System was reported in a newspaper and magazine. Brochures and sales presentations were developed, and a Washington, D.C., sales office was opened. Subsequently, Boston and Chicago offices were opened. During the spring of 1979, Communications did not have sufficient funding to adequately market System.

## The Results

Subsequent to the injection of capital via Partnership, little of the contemplated marketing was accomplished by Marketing, Communications, Alta, or Partnership. During the fall of 1980, an officer of Communications quit because of strained relations, his belief that company management was, to some degree, unethical, and because System's product potential did not materialize. At that same time, Communications' board of directors was informed that Stephen Weidner was under Federal investigation in connection with his syndication of "coal interests." Communications' board engaged the accounting firm of Deloitte, Haskins and Sells to determine how Partnership's payments to Communications had been utilized.

---

[5]The record is hazy on this point, but it appears that less than 5 Systems were sold between Oct. 1, 1979, through Dec. 31, 1980.

Deloitte, Haskins and Sells determined that Stephen Weidner had caused Communications to enter into about $2 million in consulting agreements with corporations owned by Stephen Weidner. Other misappropriations of Communications' funds were reported by the accounting firm. As a result, some of Partnership's limited partners filed suit seeking damages against Stephen Weidner. The limited partners alleged that Stephen Weidner had made false representations as to projected cash-flow, sales, earnings, and returns on capital at risk regarding System. The suit was settled on June 1, 1981, by Stephen Weidner's transferring all of his Communications stock to the limited partners of Partnership. Partnership's limited partners also sued Peat, Marwick, Mitchell & Co., Alta, and Dr. Stanford[6] alleging, in part, that the projections in the offering memorandum significantly overstated Systems' earnings projections. At about the same time, Alta resigned as Partnership's general partner.

In December 1982, an unrelated company purchased 51 percent of the outstanding shares of Communications for $3,065,000, composed of $1,500,000 cash and $1,565,000 in promissory notes. The purchaser also loaned $2 million to Communications. At about the same time, Partnership's license agreement for System was terminated.

## System's Uses, Potential and Value

System was designed to assist professional translators. Written material, in one language, is entered and the System translates it into the second language. The System does not provide word-for-word translation, but generally provides sentence-sized groupings of words with a similar or the same meaning in the second language. The translation is about 80-percent accurate, and a professional translator must accomplish necessary refinements and other editing. System provides synonyms for selection by the professional translator and a split screen which permits comparison of the material in both languages. System's core dictionary is 8,000 to 15,000 word-pairs and may be expanded by the user to accommodate up to 1 million word-pairs.

---

[6]Dr. Melvin J. Stanford had prepared a market and financial study for Communications. The market projections were utilized in the offering materials.

System assisted in translations at an average rate of 450 to 600 words per hour. System's promoters believed that for short periods of time it could assist in achieving over 1,000 words of translation per hour.[7] Manual translation (without computer assistance) is accomplished at a 150 to 200 average word-per-hour rate. Based upon the number of words per hour, it was projected that System would assist in translating at a cost of 3 to 5 cents per word. Actual use by Princeton International Translators, Inc. (one of the earliest purchasers and users of System), resulted in a cost of about 5 cents per word. The cost of manual translation during 1979 ranged from 4 to 9 cents per word. Accordingly, machine-assisted translations, although about 3 times faster than manual translations, may have been more costly to produce on a per-word basis because of the substantial capital investment in the computer hardware and software.

During 1980, System was considered a new technological product requiring further software refinement. One large company tested System on a 12-month basis and decided against permanent use because System failed to meet its productivity goals. System was designed to be used in an interactive manner by a translator. The 12-month test was conducted without the interactive use by translators. Typists would type the words into System, and hard copy was produced and pencil-edited by translators. Accordingly, during the early stages of System's development, its most efficient use was by a translator who interacted with System. This factor and a market and financial study by Dr. Melvin J. Stanford[8] would appear to limit System's application to professional translators. Dr. Stanford's report indicates that translators are relatively transient. The universe of translators is generally composed of smaller service-oriented organizations for which System would be an

---

[7] Translation work causes fatigue, resulting in reduced productivity. A translator without technological machine assistance may achieve 400 to 450 words of translated material for the first hour and progressively fewer words in each successive hour, resulting in a daily average of 150 to 200 words of translation per hour. In a similar manner, the human involvement in machine-assisted translation may permit a 1,000-words output for the first hour with successive reductions, resulting in a 450 to 600 average hourly rate on a daily basis.

[8] Dr. Stanford's May 1979 revised edition, indicates that "most individuals or organizations requiring translation look to the services of translation agencies or free lance translators." Moreover, only 10 percent of translators are full-time and 90 percent of entrants into the translation industry will fail within 5 years. Accordingly, these factors would reduce the number of potential customers among large corporate entities.

extraordinary expenditure. No evidence was introduced of fully successful use of System prior to 1982, when Partnership's license agreement with Communications was terminated. Although Dr. Stanford had researched and written a report on the translation industry, that industry had very limited experience with computer-assisted translation. Furthermore, Dr. Stanford's reports and research did not focus specifically upon the need for translation to and from English or Spanish, which to some extent would have reduced the projected market for System.

The accounting firm of Peat, Marwick, Mitchell & Co., during 1979, prepared financial projections based upon data from Communications and Dr. Stanford's reports. These financial projections, which were included in promotional materials, were based on the assumption that the data supplied were correct or appropriate, but without any verification of same by Peat, Marwick, Mitchell & Co. Dr. Stanford projected sales of 22 Systems for 1980, doubling to 44 in 1981, and thereafter increasing 50 percent annually and leveling off at 134 Systems in 1984 and beyond. Assuming a $155,000 sales price for each System, Partnership's gross receipts, after reduction for 15-percent selling fees to Marketing and net earnings before taxes, were generally projected as follows:

| Year | Number of sales projected in Stanford report | Gross receipts to partnership at 20 percent of $155,000 per unit | Net earnings to limited partners before taxes and payment of debt service |
|------|------|------|------|
| 1980 | 22  | 682,000   | ($1,995,600) |
| 1981 | 44  | 1,445,800 | 1,373,300 |
| 1982 | 66  | 2,298,800 | 2,207,400 |
| 1983 | 99  | 3,655,200 | 3,534,700 |
| 1984 | 134 | 5,244,400 | 5,097,500 |

The limited partner-petitioners were to have a passive role in promotion and sales and their involvement in System was basically limited to being a source of financing. Their return was limited to 20 percent after sales expenses, and a slightly smaller net return after operating expenses. The limited partners were liable to Communications only to the extent of their cash investments and recourse loans totaling $5,200,000. The $8 million nonrecourse amounts were essen-

tially payable out of 10 percent of the revenues. Only considering recourse notes and cash investment and based upon projected net earnings, the limited partners were to receive no less than a 10-percent return and as much as a 100-percent return in years after 1983. These percentages do not consider tax benefits that were anticipated for limited partner-investors.

Dr. Stanford's market and sales projections were unrealistically high and overstated. This was particularly so since the product was not well known to the market, and it was not cost competitive with manual translation. It also appears that the necessary capital expenditure ($155,000) would have substantially limited the potential market. In addition, it was not known what percentage of the users of translations had a need for the Spanish-English language program, which was the only software available in 1979. Dr. Stanford also overestimated the word-per-hour capacity of System at 2,000 in evaluating its market potential.

Respondent's proffered expert, American Technology Appraisal Service, through a report and the testimony of Jonathan C. Moody (Moody), proposed a value for the System license of "approximately $300,000, at a maximum, including profit to the developer, for the [System]." Moody treated System merely as software with a development cost of $300,000, based upon 20,000 lines of code or "nine man-years" of effort. Moody ignored the developer's technological expertise and "know-how." He did not consider goodwill, the sales and marketing availability of Communications and Marketing, or the potential market. Moody also failed to consider the effective integration of the software with less expensive, compatible hardware. In prior applications larger, more expensive hardware was required.

Petitioners' proffered expert, Wasatch Advisors, through a report and the testimony of Samuel S. Stewart, Jr. (Stewart), proposed a value range for the license from $5,071,400 to $8,342,800, depending upon the method of valuation. Stewart used an income, a transaction, and two market value approaches. In each approach, with the exception of the "transaction value" approach, the projections of the Stanford report were used. A rate is applied to the Stanford report's projected earnings or cash-flow. The

rates were variously derived from rates returned by "comparable" companies, average rates of return from various investments, along with an inflation factor and a price earnings approach. The "transaction value" looks to the willing buyer and seller, and petitioners' expert opined that the 35 limited partnership units sold for $176,000 each for a value of $6,160,000 and, accordingly, had that value. This approach is normally used where there is an established market for the asset, such as a stock exchange.

The value of the System license as of October 1, 1979, was no more than $5,200,000.

## The Sponsor's Organization Fee

Alta was to receive 10 percent of the gross proceeds from sale of limited partners' units, or $616,000, as a "Sponsor's Organization Fee." Costs for legal, accounting, printing, and Blue Sky registration relating to the organization of Partnership were separately referenced in the offering memorandum and were to be borne by Partnership. Alta was to pay commissions, fees, and other expenses of the offering from its "Sponsor's Organization Fee." If Partnership units were sold by others, Alta was authorized to cede part or all of its 10-percent "Sponsor's Organization Fee" to the seller. Partnership paid Alta $308,000 in 1979 and $188,900 in 1980 as "Sponsor's Organization Fees." Partnership treated these payments as currently deductible and limited partners claimed losses for 1979 and 1980 and their income tax returns apportioned shares of the $308,000 in 1979 and $188,900 in 1980.

## OPINION

Petitioners entered into a licensing transaction which was designed and structured to provide tax benefits by compliance with section 1253. Respondent questioned both the substance of petitioners' transactions and their compliance with the statute and regulations. Petitioners seek amortization deductions for payments made under the license agreement. Although the 1979 and 1980 payments were made in cash, we must consider: (1) Whether nonrecourse notes (which may be used to satisfy future obligations

under the agreement) may be treated as "payment" for purposes of section 1253; (2) whether the nonrecourse notes had economic substance; and (3) whether the nonrecourse notes were supported by the underlying value of the license.

### Statutory Background - Section 1253

Diversity among the Federal Circuit Courts of Appeals and lower courts motivated Congress to enact section 1253 as part of the Tax Reform Act of 1969, effective for transactions after December 31, 1969. Confusion existed in determining whether a transfer of a franchise was to be treated as a sale or license and, accordingly, whether the transferor was to receive capital gains or ordinary income treatment. S. Rept. 91-552 (1969), 1969-3 C.B. 423, 554. Under section 1253, retention of "any significant power, right, or continuing interest" in the franchise will result in ordinary income treatment to the transferor. The parties agree that the franchise under consideration was licensed and not sold to Partnership.

Prior to the enactment of section 1253, payments to acquire a franchise were not deductible as depreciation or amortization because "franchises * * * are considered to be intangible assets with unascertainable useful lives." S. Rept. 91-552, *supra*, 1969-3 C.B. at 555. The amount and timing of deductions by a franchise licensee are governed by section 1253(d). Payments contingent "on the productivity, use, or disposition of the franchise" are contemporaneously deductible under section 162(a). Sec. 1253(d)(1).

"Non-contingent" or "other payments" are divided into three categories. A single payment is ratably deductible over the shorter of 10 years or the term of the license agreement.[9] Sec. 1253(d)(2)(A). Where the payment is part of a series of approximately equal payments for more than 10 years or the entire term of the franchise license, the payments are contemporaneously deductible. Sec. 1253(d)(2)(B). All other payments are to be treated in accordance with regulations promulgated "by the Secretary." Sec. 1253(d)(2)(C).

---

[9] The measurement of these terms generally throughout sec. 1253 begins with the year in which the first payment is made.

Pursuant to section 1253(d)(2)(C), proposed regulations were published July 15, 1971, but final or permanent regulations have not been published or issued.[10] The proposed regulations provide for three situations not specifically covered in the statute. Section 1.1253-1(c)(3)(iii), Proposed Regs., 36 Fed. Reg. 13,150 (July 15, 1971), covers a series of approximately equal payments for a period of less than 10 years. Essentially, the payments, in aggregate, would be ratably deductible for the shorter of 10 years or the term of the license. Section 1.1253-1(c)(3)(iv), Proposed Regs., 36 Fed. Reg. 13,150, involves a series of unequal payments for more than 10 years or the term of the license. This subsection would permit a deduction in the year of payment so long as the payment is no more than 20 percent of the "principal sum" and no more than 75 percent of the "principal sum" is paid in the first half of the license term or 10 years, whichever is shorter. Section 1.1253-1(c)(3)(v), Proposed Regs., 36 Fed. Reg. 13,150, covers unequal payments for 10 years or less and where the license term is longer than the payment schedule. A ratable deduction is permitted over the shorter of 10 years or the term of the license so long as the total ratable amounts do not exceed the total actual payments during any year. Finally, the proposed regulations provide that other possible circumstances of payment may be submitted in writing to respondent for a determination of the amount and timing of permissible deductions.

In order to apply the formulae of the statute or proposed regulations, we must first determine the "principal sum" for the license, whether payments are contingent or "other payments," and whether the payments are "equal" or "unequal."

### The "Principal Sum" Under Section 1253

The amounts and timing of the payments structured by the promoters of interest in Partnership were designed to

---

[10]Petitioners and respondent have briefed their respective positions relying upon the above-referenced proposed regulations. Petitioners have not argued or contended that the proposed regulations are invalid or without legal stature. Although our opinion does not conflict with the proposed regulations, we do not rely upon them as authority because they "carry no more weight than a position advanced on brief by the respondent." *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970); *Miller v. Commissioner*, 70 T.C. 448, 460 (1978). See also *Mearkle v. Commissioner*, 87 T.C. 527 (1986).

take advantage of the deductions that would be permitted under the terms of section 1.1253-1(c)(3)(iv), Proposed Regs., *supra*. The 20-year license term exceeds the 10-year minimum and the payments were to be unequal—$2,600,000 in 1979 and 1980 and $1 million annually for 8 years, beginning 1985. Under these circumstances, each payment would be deductible in the year of payment, so long as no payment exceeds 20 percent of the "principal sum" and no more than 75 percent of the "principal sum" is paid in the first half of the license term. Under the terms of the offering memorandum, the "principal sum" was to be $13,200,000 and, accordingly, the $2,600,000 payments in 1979 and 1980 would each be $40,000 less than 20 percent ($13,200,000 × .20 = $2,640,000). In a similar manner, the $1 million payments were delayed 4 years to permit compliance with the 75-percent requirement. Under the 75-percent requirement, no more than $9,900,000 could be paid and deducted before 1989. Considering the $2,600,000 proposed payments in 1979 and 1980 and the four $1 million payments from 1985 through 1988, the payments would have fallen $700,000 short of the $9,900,000, at $9,200,000. If the $1 million nonrecourse notes are considered "payments" and all payments are "non-contingent," then each of Partnership's investors would be able to "write-off" nearly 85 percent of their cash investment during the first 2 years.[11] Respondent questions whether the eight $1 million nonrecourse notes can be considered part of the "principal sum" or whether they have economic significance. If they are part of the "principal sum," respondent contends that the $1 million amounts are contingent.

In *Jackson v. Commissioner*, 86 T.C. 492 (1986), we recently held that a nonrecourse note can constitute "payment" for purposes of section 1253(d)(2). Our holding was that "payment" in section 1253 was not dependent upon cash or cash equivalence, but that the use of notes or other

---

[11]Partnership was to have 35 partners, each of whom invested $176,000 for a total of $6,160,000. Of that amount, $5,200,000 was to be paid to Communications during the first 2 years. Accordingly, 84.4 percent of cash investments ($5,200,000 - $6,160,000) would be "written-off," or $148,544 for each $176,000 investment and $74,272 for each $88,000 investment. We observe that this is not a highly leveraged investment and the proposed ratio of cash to debt was most conservative.

valuable property can constitute payment. We found that the use of notes or other valuable consideration can constitute payment under section 1253(d)(2). However, there must be economic substance supporting the existence and stated value of the debt obligation for the note or other property to constitute payment. *Jackson v. Commissioner*, *supra* at 521. Accordingly, we must focus upon respondent's contention that the nonrecourse notes lack economic substance or are contingent and speculative.

## *Nonrecourse Notes - Economic Substance - Contingent or Speculative*

Numerous opinions analyze nonrecourse notes to determine whether they should be considered as part of the basis of property for purposes of depreciation, gain, or loss. E.g., *Tufts v. Commissioner*, 461 U.S. 300 (1983); *Crane v. Commissioner*, 331 U.S. 1 (1947). Here, the issues involving nonrecourse notes do not directly involve deductibility of the notes. Instead, we focus upon the notes' "role" in the formulae contained in section 1253 and the proposed regulations. The claimed deductions of the cash payments are dependent upon the nonrecourse notes being considered a part of the "principal sum." The standards for nonrecourse notes should not vary under these circumstances. Respondent argues that the nonrecourse notes lack economic substance because the purchase price or "principal sum" exceeded the value of the underlying license, at least by the $8 million to be represented by the nonrecourse notes. Petitioners argue that the $8 million indebtedness is genuine and supported by the value of the license. Petitioners also point out that should the license's value be less than $13,200,000 as the result of a "bad bargain," there remains "an actual investment." In other words, petitioners urge us to use a good-faith standard. Petitioners argue that so long as the price was set at arm's-length and without collusion, respondent and the courts must accept the ensuing results. We cannot agree. We are not compelled to give credence to nonrecourse debt merely because the parties dealt at arm's length or were without business acumen. That is not to say that we must disregard the existence of a sale if the purported sales price is not, for tax

purposes, the amount stated in the agreement. *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975).

To secure a tax benefit based upon the form of a transaction, a taxpayer must show the existence of some economic significance or bona fide purpose other than the avoidance of tax. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). More specifically, petitioners must show that the nonrecourse notes have economic significance in the context of the subject transaction. If the stated purchase price unreasonably exceeds the value of the interest acquired (or when the principal amount of the note unreasonably exceeds the value of the property securing the note), the liability relied upon for a tax benefit may not be considered genuine or having economic significance. *Estate of Franklin v. Commissioner, supra* at 1049; *Hager v. Commissioner*, 76 T.C. 759, 773-774 (1981). We have found that the value of License as of October 1, 1979, was no more than $5,200,000. Our finding is based upon the following considerations: (1) As of October 1, 1979, only an inconsequential amount of advance marketing had been accomplished. (2) The response from marketing in advance of October 1, 1979, was not sufficient to value the license at more than $5,200,000. (3) Dr. Stanford's market studies did not support the ultimate potential sales projections because: (a) Dr. Stanford accepted inflated translation production estimates and costs from Stephen Weidner or Communications; (b) the market study did not focus upon the need for Spanish-English translation; and (c) the market study did not appropriately consider the relatively large capital expenditure in relation to the ability of potential purchasers to return a profit after considering capital investment. (4) The product was not fully tested and possessed numerous problems common to new products.

Moreover, the transaction was structured so as to render the existence of the nonrecourse notes totally economically insignificant to either party. The sole purpose for the nonrecourse notes was to permit investors to deduct their cash investment on the front end of the transaction by simulating compliance in form with section 1.1253-1(c)(3)(iv), Proposed Regs., *supra.* Under the terms of the license

agreement, Partnership was to make two $2,600,000 payments in 1979 and 1980. Five years later, Partnership was to commence annual aggregate payments of $1 million which could be satisfied, at Partnership's option, by means of 6-percent simple interest nonrecourse notes. In addition to those terms, Partnership was to pay Communications 10 percent of gross sales, but any of the $2,600,000 payments would be "credited against" the 10 percent. In a similar manner, payment by means of the $1 million nonrecourse note could be obviated by remittance of 10 percent of gross sales, if gross sales exceeded the balance of outstanding nonrecourse notes. The net effect of this agreement is a 20-year license in exchange for 10 percent of gross sales or $5,200,000, whichever is larger. The insignificance of the nonrecourse notes is further highlighted by Partnership's option to terminate or walk away from the license agreement without penalty upon 30 days' notice.

In a similar vein, courts have found promissory obligations to be too contingent to be considered part of a taxpayer's basis or to be considered effective to obtain other tax benefits. *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); *Estate of Baron v. Commissioner*, 83 T.C. 542, 549-550 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *Saviano v. Commissioner*, 80 T.C. 955, 962-963 (1983), affd. 765 F.2d 643 (7th Cir. 1985). Petitioners have argued that the too speculative or contingent rationale is limited to situations where taxpayers are relying upon the promissory obligation for a deduction. In other words, petitioners suggest that there must be a direct relationship and reliance upon the note as payment before the rationale is applied. We disagree. The question is whether the notes or obligation should be given any effect, either as part of a formula to compute a deductible amount or as the deductible amount. Petitioners also contend that the speculative and contingent rationale should be employed only where a taxpayer abuses the spirit while honoring the letter of the statute or regulation. It is not necessary to first find that a transaction was a gross abuse of tax statutes or principles before we find that its

substance is different from its form.[12] There were no underlying capital assets to secure the nonrecourse notes. The notes were essentially only payable if 10 percent of gross sales did not exceed the stated note balances.[13] It appears clear that any shortfall would not have been paid because of the failure to generate sales, the only source of revenue or assets for Partnership or Communications. As previously discussed, the sales projections were excessive and the notes, in addition to having no business or "non-tax" purpose in the transaction, were too contingent and speculative to be considered part of the purchase price for purposes of section 1253 or other tax benefits. Accordingly, we hold that the $8 million portion of the purchase price is not a part of the "principal sum" for purposes of computing the amount and timing of deduction under section 1253.

Petitioners, as an alternative position, argue that if the purchase price (or "principal sum") is found to be $5,200,000, then Partnership would be entitled to $520,000 in amortization deductions in 1979 and 1980. Petitioners argue that this result is provided for in section 1.1253-1(c)(3)(v), Proposed Regs., *supra*, because the actual payments were unequal although the agreement called for two payments of $2,600,000. Section 1.1253-1(c)(3)(v), Proposed Regs., *supra*, covers unequal payments for 10 years or less where the license term is larger than the payment schedule.

Respondent agrees that Partnership would be entitled to $520,000 amortization for 1979 and 1980, and refers us to section 1.1253-1(c)(3)(iii), Proposed Regs., *supra*, which provides for equal payments for 10 years or less. The parties' agreement on a 10-year ratable amortization schedule, or $520,000 per year, obviates the need to resolve whether the 1979 and 1980 payments are equal or unequal for purposes of this case. We hold that Partnership (and each of the petitioners in an amount in accord with his partnership

---

[12]The ratio of deductions to investments does not appear abusive in amount (less than 1 to 1). Respondent has not questioned profit motive and we do not consider or find that Partnership or petitioners were not engaged in an activity for profit.

[13]We have assumed that Partnership would not pay $1 million cash if it was permitted to use 6-percent simple interest nonrecourse notes only payable out of revenues from the asset for which the notes are purported payment.

interest) is entitled to amortize $520,000 of License during 1979 and 1980.

## Sponsor's Fees

The private placement memorandum provided for "sponsor's fees" of 10 percent of receipts from the sale of Partnership interest to Alta, the general partner. The total $6,160,000 partnership offering would have generated "sponsor's fees" totaling $616,000. The stated purpose of the "sponsor's fees" was—

for organization of the Partnership * * * out of which [Alta] may pay commissions and fees of up to 10 % of the amount received by the Partnership and [Alta] will pay all other costs in connection with the Offering other than legal and accounting fees, printing costs and Blue Sky qualification expenses, which will be paid by the Partnership. * * *

Under section 709(a), no deduction is generally allowed for amounts paid to organize a partnership or to promote a partnership interest. Section 709(b) provides for 60 months' amortization of organization fees, if they (1) are incidental to creation of the partnership, (2) are chargeable to the capital account, and (3) are of an amortizable character. Section 709(b) is available only if properly elected. Under the regulations, issued in 1983 and retroactive for taxable years beginning after December 31, 1975, syndicated expenses must be capitalized and are not subject to the section 709(b) election. Sec. 1.709-2(b), Income Tax Regs. Other examples of expenses not subject to the section 709(b) election include expenses connected with acquiring partnership assets and admission or removal of partners after the partnership is organized. Sec. 1.709-2(a), Income Tax Regs.

The parties have stipulated and have agreed that Partnership paid "sponsor's fees" to Alta of $308,000 in 1979 and $188,900 in 1980. Each of the limited partners claimed his apportioned share of these amounts in the year of payment. On Partnership's Federal income tax return for 1979, a "709(b) election" was made with respect to amortization of $72,006 in "organization costs." The $308,000 sponsor's fee[14] was claimed as a current deduction. The 1980 partner-

---

[14]The $308,000 was claimed as part of a $323,000 amount.

ship return referenced the $72,006 "organization costs" and claimed 12 months' amortization. The $188,900 "sponsor's fee" was claimed for 1980 as a current deduction. The record is otherwise void of detail which would permit us to delineate whether the $308,000 and $188,900 "sponsor's fees" were composed of commissions for sales of partnership interests (syndication fees) or were for organization costs.[15]

Petitioners, on brief, "concede that a portion of [the sponsor's] fees were for syndication expenses." Petitioners then argue that the offering memorandum permitted Alta to pay organizational-type expenses. After admitting that "An exact tracing [of sponsor's fees] is unfortunately not possible," petitioners suggest that the division between organization and syndication expenditures may be reconstructed by means of extrapolation. Petitioners suggest that by analyzing all of the checks written and ledger accounts of Alta for 1979 and 1980 one would be able to break down expenditures into those for syndication, not for syndication, or for miscellaneous expenditures. Thereafter, ratios or percentages would be developed and applied to the $308,000 and $188,900 claimed sponsor's fees. Petitioners, unfortunately, have not provided evidence in the record which would permit us to corroborate, verify, or understand their choice of the category in which each check should be classified. Although petitioners have provided the summarized totals from which they suggest we could delineate expenses, the number provided is not sufficient to carry petitioners' burden of establishing that the "sponsor's fees" are deductible. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Accordingly, we find that petitioners are not entitled to deduct the $308,000 and $188,900 "sponsor's fees" claimed for the taxable years 1979 and 1980, respectively.

> *Decisions will be entered under Rule 155 in all dockets.*

---

[15]If we were to determine that any portion of the "sponsor's fees" were "organizational expenses," they would be amortizable over 60 months and not fully deductible in the year of payment, as claimed on the 1979 and 1980 partnership returns.